# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

GREGORY P. BARTUNEK,

       Plaintiff,

vs.

HALL COUNTY, NEBRASKA, and
TODD BAHENSKY in his individual and
official capacities,

       Defendants.

**8:18CV489**

**MEMORANDUM
AND ORDER**

Plaintiff Gregory Bartunek, who is proceeding pro se, brings this 42 U.S.C. § 1983 action challenging the conditions of his six-month confinement at the Hall County Department of Corrections, where he was being temporarily held as a federal pretrial detainee pursuant to an agreement with the United States Department of Justice.[1] Requesting compensatory and punitive damages,[2] Plaintiff sues Defendants Hall County and Todd Bahensky, Director of the Hall County Department of Corrections, in his official capacity for injury caused by their alleged unconstitutional policy or custom of depriving inmates of basic services.[3] Plaintiff also sues Bahensky in his individual capacity.

---

[1] Plaintiff now resides at a federal correctional institution in Seagoville, Texas.

[2] Plaintiff's request for injunctive relief was previously denied as moot because he no longer resides at the institution that is the subject of his claims. (Filing 12 at CM/ECF p. 11.) *See Randolph v. Rodgers*, 253 F.3d 342, 345 (8th Cir. 2001) (when actions required by injunction would be impossible for correctional-center defendants to execute because plaintiff was moved to another institution, plaintiff's claims for injunctive relief against defendants were moot).

[3] Plaintiff's claim against Defendants Hall County and Bahensky in his official capacity are actually a single claim against the County and shall be construed

Plaintiff complains that Defendants limited his out-of-cell time to two hours per day; subjected him to uncomfortably cold conditions; enforced a lights-out policy that only allowed him to get five to six hours of sleep per night; and failed to repair his broken glasses or give him an eye exam, fix his hearing aids, administer routine dental care, give proper medical care for a variety of ailments, and provide any religious services despite his request. (Filing 14 at CM/ECF p. 2 (summary of Plaintiff's claims after initial review); Filing 12 at CM/ECF p. 1.)

Defendants move for summary judgment (Filing 32) on the merits as to Hall County and Bahensky in his official capacity and argue that Bahensky is entitled to qualified immunity as to Plaintiff's claims against him individually. For the reasons discussed below, I shall grant the Defendants' Motion for Summary Judgment.

## I.  UNDISPUTED MATERIAL FACTS[4]

1.      At all pertinent times, Hall County has maintained a written agreement with the United States Department of Justice, under which it may temporarily house

---

as such. *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) ("A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent.").

[4] Plaintiff objects to Defendants' Statement of Undisputed Material Facts "in it[]s entirety." (Filing 34 at CM/ECF p. 2.) However, I shall only consider proper objections that include "pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies," as required by NECivR 56.1(b)(1), and that do not constitute legal conclusions or unsupported allegations. *See Bedford v. Doe*, 880 F.3d 993, 997 (8th Cir. 2018) (in responding to motion for summary judgment, "The nonmoving party must do more than raise some metaphysical doubt about the material facts, and cannot rest on mere denials or allegations. The nonmoving party must instead present enough evidence that a jury could reasonably find in his favor." (internal citations omitted)); *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) (unsupported self-serving affidavit attempting to establish contractual terms not sufficient to defeat motion for summary judgment; "a properly supported motion for summary judgment is not defeated by self-serving affidavits"); *Davidson & Assocs.*

federal pretrial detainees and inmates at the request of the federal government. (Filing 33-1, Aff. Bahensky ¶ 5 & Ex. A.)

2.      Plaintiff Gregory Bartunek was arrested by the United States Marshals Service in February 2017 and was charged by the United States Department of Justice with federal criminal charges related to possession, receipt, or distribution of child pornography. (Filing 33-1, Aff. Bahensky ¶ 9 & Ex. C.)

3.      On or about April 25, 2018, federal law enforcement authorities elected to transfer Plaintiff Bartunek, then a pretrial detainee, to the Hall County Department of Corrections ("HCDC"), where he was at all times classified to be housed in the maximum-security unit due to the nature of his charges. (Filing 33-4 at CM/ECF pp. 1-3, 7, 11, 18, 23, 29-32, 39-41, 51; Filing 33-5 at CM/ECF p. 100 (Hall County's response to Plaintiff's complaint about his classification: "Your classification has not changed since your arrival. You are housed where you are for your own protection due to the nature of your current charges."); Filing 33-8 at CM/ECF p. 1 ("D Pod consists of inmates classified as MAXIMUM security and includes populations of accused child molesters, inmates with violent tendencies or charges, those requiring separation from other inmate populations including gang ties, behavioral separation and others.").)[5]

_____

*v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005) (to defeat a motion for summary judgment, "[a] plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor"). Defendants' Undisputed Material Facts that are not properly controverted shall be considered admitted. NECivR 56.1(b)(1). I shall comment on the merits of Plaintiff's noteworthy objections in future footnotes.

[5] Plaintiff asserts, without argument or rationale, that he should have been classified at two levels below his "Med 3" classification. He offers no evidence in support of his claim. (Filing 34 at CM/ECF p. 2.)

4.     Hall County contracts with a private company, Advanced Correctional Health Care ("ACH"), to provide medical professionals who are responsible for addressing the medical needs of those incarcerated in the HCDC population. (Filing 33-1, Aff. Bahensky ¶ 4.)[6]

5.     Plaintiff was housed at the HCDC from April 25, 2018, to October 23, 2018. (Filing 33-1 at CM/ECF p. 3.) On December 6, 2018—shortly after Plaintiff left the HCDC—the HCDC was determined to be in full compliance with the Nebraska Minimum Jail Standards by a Jail Standards Field Representative for the Nebraska Commission on Law Enforcement and Criminal Justice after an annual inspection required by Neb. Rev. Stat. § 83-4,131 (Westlaw 2020). (Filing 33-7.) The State of Nebraska Minimum Jail Standards for Adult Jail Facilities are set forth in Title 81, Chapters 1-15 of the Nebraska Administrative Code, and may be found at https://ncc.nebraska.gov/documents-0. (Filing 33-1, Aff. Bahensky ¶¶ 12, 14.)[7]

6.     State minimum jail standards for adult jail facilities include the following pertinent provisions:

●   Title 81, Chapter 15, section 006.04, governing "Heating and Cooling Systems," provides that the living environment at "newly constructed and renovated jail facilities" shall have "temperatures maintained between sixty-five (65) and eighty (80) degrees Fahrenheit."

---

[6] Plaintiff's objection to the quality of ACH's care does not controvert this particular Undisputed Material Fact. (Filing 34 at CM/ECF p. 2.)

[7] Plaintiff's argument (Filing 34 at CM/ECF p. 3) that the complaints and grievances he filed during his stay at the HCDC prove that the facility did not comply with applicable jail standards does not properly controvert the Defendants' proof that the HCDC was deemed to be compliant with relevant jail standards after an annual inspection on December 6, 2018.

- Title 81, Chapter 7, section 003.01, provides that inmates "shall have opportunities for active physical exercise at least one (1) hour per day, five days per week outside their cells."

- Title 81, Chapter 12, section 003, provides that the facility administrator "shall, to the best of his ability, insure the right of inmates to practice and express their religious beliefs." However, this section does not require any particular type or frequency of access to religious events.

- Title 81, Chapter 10, sections 001 and 002, provide that: "It is the policy of the State of Nebraska that all jail facilities shall provide all inmates with a healthful environment and access to adequate medical care"; that only a medical authority can diagnose any illness or injury, give treatment, or prescribe medication, except in emergencies; and that the facility administrator "shall make provisions for the daily collection and review of inmate medical complaints and to insure that each inmate is observed on a regular basis" and "to the best of his ability, insure that the proper medical attention is provided as soon as possible" when there are "indications of illness or injury."

- Title 81, Chapter 10, section 002.07, provides that: "Any inmate known to be seriously ill or injured shall be examined by a medical authority, delivered to an emergency center, or the proper judicial authority shall be forthwith requested to release the inmate."

7. Inmates and detainees of the HCDC have access to an electronic kiosk system where they are able to submit requests and grievances (except when special circumstances may require the use of paper forms), which Plaintiff accessed and utilized on many occasions throughout his stay at the HCDC.[8] (Filing 33-1, Aff.

---

[8]Plaintiff's frequent complaints, requests, and commentary submitted through the kiosk system included, "why do you allow illegal immigrants [to] control tv?"

Bahensky ¶ 6; Filing 33-3 at CM/ECF pp. 13, 34-35; Filing 33-5 at CM/ECF pp. 1-117.)

8.    During the six months he was housed there, Plaintiff submitted the following requests to HCDC staff or ACH medical personnel pertaining to the temperature in the jail. (Filing 33-1, Aff. Bahensky ¶¶ 9-11; Filings 33-4, 33-5, 33-6.)

● On April 26, 2018—one day after Plaintiff was moved to the HCDC and was fully examined by a medical practitioner—Plaintiff complained to medical staff that he was "cold all the time" and was "cold even with a blanket." (Filing 33-6 at CM/ECF pp. 3-4.)

● On April 28, 2018, Plaintiff submitted a complaint to staff, stating, "I am cold all the time. I have a subnormal body temp and can't keep warm day or night. I asked med but they said they could not help. I have thermals Douglas County sold me in my property. Can you help me to stay warm?," and staff responded two days later, "Denied." (Filing 33-4 at CM/ECF p. 60 (spacing corrected).)

● On May 11, 2018, Plaintiff submitted a request to "Medical," stating, "I can't get warm. Hands and feet freezing. Didn't start till I was transferred here. Ined [sic] doctor. Now I have cold. Cold at night too. No one else seems to be affcted [sic]. Let me know when I can receive treatment. Thanks."

_____

(Filing 33-5 at CM/ECF p. 12); "i have hiccups almost all the time" (Filing 33-5 at CM/ECF p. 18); "test of system" (Filing 33-5 at CM/ECF pp. 70, 71); "razors very poor" (Filing 33-5 at CM/ECF p. 104); "kiosk bad" (Filing 33-5 at CM/ECF p. 106); "why do some COs get mad when I ask a question?" (Filing 33-5 at CM/ECF p. 15); and "we need more time to get ready for library and rec. co's announce it and run out door. i suggest waiting till 15 after or check list or both" (Filing 33-5 at CM/ECF p. 102).

(Filing 33-4 at CM/ECF p. 59.) Plaintiff's jail medical chart indicates that he was examined on May 12, 2018, by a nurse who noted "visible purple veins mid lower leg to feet" and "tips of fingers cold pedal pulses present." No new orders were given, but the nurse educated Plaintiff to wear socks, increase his water intake, and exercise. (Filing 33-6 at CM/ECF p. 5.)

● On June 4, 2018, Plaintiff submitted a grievance stating, "According to the handbook I have right to proper clothing and medical treatment. This right is bein [sic] violated because I am cold all the time. I did not have this problem until I came here. Please do what it takes to fix this." The next day HCDC staff replied, "You have the same clothing as everyone else. What kind of medical treatment are you not getting? The temperature is 72 degrees in the dayroom and sleeping area." (Filing 33-4 at CM/ECF p. 57.)

● On June 6, 2018, Plaintiff submitted a grievance appeal stating, "Telling me what you believe the temperature is does not address the problem. I am still cold and in needless pain and suffering. Proper clothing is a simple and reasonable solution. I suggest my thermals I got in property from Douglas. This is in RE to No. 161984. Thanks." The next day HCDC staff replied, "We have a computer that tells us what the temperature is in the dayroom and in the cells. In fact right now the temperature in the cells are 75.3 which is down from 78.2. As far as extra clothing we do not allow it." (Filing 33-4 at CM/ECF p. 58.)

● Plaintiff submitted a handwritten letter to Director Bahensky dated July 31, 2018, accusing the HCDC of violating his constitutional rights by "not allowing me the proper clothing to keep warm," which constituted "punishment that qualifies as abuse of the elderly." (Filing 33-4 at CM/ECF p. 27.) Director Bahensky replied in writing to Plaintiff and explained that the temperature of the facility, as measured after each of Plaintiff's complaints, had been verified to be within the requirements of Nebraska Jail Standards,

and that other inmates had complained in the same time period that it was too hot, rather than too cold. (Filing 33-4 at CM/ECF p. 29.)

● On October 10, 2018, at 8:38 p.m., Plaintiff submitted a complaint to staff stating, "I'm cold," and an HCDC staff member replied, "Maintenance will turn the heat up." (Filing 33-5 at CM/ECF p. 3.) Approximately two minutes later on same day, October 10, 2018, at 8:40 p.m., Plaintiff submitted a request directed to "medical" stating, "I'm still very cold." (Filing 33-6 at CM/ECF p. 25.) Plaintiff's jail medical chart shows that he was examined by a nurse on October 11, 2018. While no new medical orders were given, Plaintiff's request for an extra blanket was approved, and he was educated to "drink plenty of water." (Filing 33-5 at CM/ECF p. 2.) Applicable jail standards require all bedding, presumably including blankets, to "remain on the bunk." (Filing 33-3 at CM/ECF p. 14.)

● On October 15, 2018, Plaintiff submitted a "complaint" stating, "me and the boys are cold in the day room. can you crank up the heat to 76? thank you kindly." Two days later an HCDC staff member replied, "I will let maintenance know." (Filing 33-5 at CM/ECF p. 1.)

9.      On August 24, 2018, a fight broke out amongst the "most violent and highest classified inmate population," who were held in Plaintiff's housing area, necessitating a lockdown that limited the amount of time inmates were allowed out of their cells. The lockdown was deemed necessary to ensure inmate safety, especially in light of "the multitude of verbal and written threats." (Filing 33-4 at CM/ECF p. 23.) During the six months Plaintiff was detained at the HCDC, he submitted the following requests to HCDC staff or ACH medical personnel pertaining to the amount of time he received outside of his cell.

● On August 30, 2018, Plaintiff submitted a complaint that stated, "when will the tornado warning be over, so we can get more time out? i

believe the tornado has left a long time ago. thanks," to which HCDC staff replied the next day, "Taken care of." (Filing 33-5 at CM/ECF p. 65.)

● On August 31, 2018, Plaintiff submitted a complaint that stated, "do you know when the 22 hour lockdown will be over? can i be moved to another block with more time out?," to which HCDC staff replied on September 4, 2018, "At this time I don't know. As far as I know no one is moving." (Filing 33-5 at CM/ECF p. 66.)

● On September 1, 2018, Plaintiff submitted a grievance stating, "page 24 of inmate manual says we get out every other hour, unless facility needs change. what is the need to change to once every 4 hours? page 5 says we have right to know. thanks. and what need to keep it that way for over a week?" Plaintiff's grievance was "closed" two days later without receiving a response from the HCDC.[9] (Filing 33-5 at CM/ECF p. 69.)

● On September 8, 2018, Plaintiff submitted a handwritten grievance appeal complaining that "keeping inmates of cell Block D locked down for 22 hours/day for over 2 weeks is a violation of R4 of the Inmate Manual," asserting that the lockdown was a "fear-based overreaction" to a "disturbance" on August 24, 2018, and suggesting that the HCDC "talk to" Douglas County "to see how it is done." (Filing 33-4 at CM/ECF p. 22.) The Assistant Director of the HCDC replied in writing to Plaintiff's grievance appeal, explaining that the lockdown "in the most violent and highest classified inmate population" was necessary to ensure inmate safety and security after a fight broke out in Plaintiff's unit on August 24, 2018. The Assistant Director stated that the lockdown was necessary to "address the multitude of verbal and written threats" and reminded Plaintiff that there

---

[9] Plaintiff claims in his brief, without supporting evidence, that his grievance was closed due to "a malfunction of the Kiosk system." (Filing 34, Pl.'s Br. at CM/ECF p. 6.)

continued to be access to all programming, and good behavior would be considered in upcoming classification reviews. (Filing 33-4 at CM/ECF p. 23.)

● On September 26, 2018, Plaintiff submitted a grievance stating, "This 22 hour lockdown is causing me severe mental and physical anguish and pain and suffering," to which the HCDC Assistant Director on September 28, 2018, advised Plaintiff to contact Mental Health, "as they are available for just this type of challenge and can provide you insights on addressing these feelings and experiences." (Filing 33-5 at CM/ECF p. 96.) The same day, Plaintiff submitted a request to "Mental Health" stating, "lockdown is very determental [sic]," to which an ACH nurse replied the next morning, "I cannot imagine. Is there something you are requesting from mental health? We can offer counseling services but we cannot lift the lockdown, unfortunately. Please let me know if you wish to be seen." (Filing 33-5 at CM/ECF p. 97.) Plaintiff's ACH medical chart shows that Plaintiff was examined by a nurse at sick call on September 27, 2018, but the only complaint he advanced at that time was a sore back, left shoulder pain, and his prediction that the rotator cuff in his left shoulder was torn. Plaintiff did not mention any mental-health complaints. (Filing 33-6 at CM/ECF p. 23.)

● Plaintiff submitted a handwritten letter to Director Bahensky dated October 3, 2018, which he characterized as a "petition" signed by other inmates in support of his request to be allowed out of his cell into the dayroom at the same time as certain other groups housed in his unit. (Filing 33-4 at CM/ECF pp. 52-53.) On October 12, 2018, Director Bahensky explained in writing why Plaintiff's request to be allowed out of his cell with certain other inmates could not be honored, including the facts that Plaintiff's "unit has had a number of behavioral problems including fighting and numerous inmates that need to [be] kept separate from one another," and granting Plaintiff's request would cause others to make the same request which, if granted, would create an "unmanageable situation and increase the risk that inmates would

inadvertently be allowed out with inmates with whom they have conflicts." Bahensky stated that Plaintiff's classification status, which was reviewed routinely per jail standards, "does not allow for us to house you in a less restrictive unit." (Filing 33-4 at CM/ECF p. 51.)

● Plaintiff claims he never received copies of his classification reviews, so he was denied the right to appeal therefrom. (Filing 34, Pl.'s Br. at CM/ECF p. 5.) However, the HCDC Inmate/Detainee Handbook in effect at the time of Plaintiff's detention only allowed appeals to be taken from "Classification reviews which result in a change in classification status." (Filing 33-3 at CM/ECF p. 8.) Plaintiff's classification status did not change during his time at the HCDC due to his criminal history and the nature of the charges against him (child pornography). (Filing 33-4 at CM/ECF pp. 1-3, 7, 11, 18, 23, 29-32, 39-41, 51; Filing 33-5 at CM/ECF p. 100 ("Your classification has not changed since your arrival. You are housed where you are for your own protection due to the nature of your current charges."); Filing 33-8 at CM/ECF p. 1 ("D Pod consists of inmates classified as MAXIMUM security and includes populations of accused child molesters, inmates with violent tendencies or charges, those requiring separation from other inmate populations including gang ties, behavioral separation and others.").)

10.    During the six months he was housed there, Plaintiff submitted the following requests to HCDC staff pertaining to his right to exercise his religion. (Filing 33-1, Aff. Bahensky ¶¶ 9-10.)

● On July 2, 2018, Plaintiff submitted a grievance stating, "i sign up for church [e]very week but it is never held. At Douglas we always had it. what can you do to help?" The Assistant Director replied that he had verified that religious services had been held several times since Plaintiff's arrival, but Plaintiff had chosen not to attend, although acknowledging that at times the volunteer leaders cancelled services, as had been the case on the day prior to his grievance. (Filing 33-5 at CM/ECF p. 11.) On July 3, 2018, Plaintiff

submitted a handwritten appeal of his grievance disagreeing with the Assistant Director's response, to which HCDC staff responded by noting that he needed to use the electronic kiosk to process his grievance. (Filing 33-4 at CM/ECF p. 34.)

● Assistant Director Gottschalk recognized for the first time when reviewing the above grievance and grievance appeal in connection with this litigation that he had mistakenly confused Plaintiff for another inmate in the maximum-security unit when he investigated and responded to Plaintiff's original grievance; however, his investigation revealed that religious programs were offered to the maximum-security unit whenever a religious provider could be located and would appear for maximum-security inmates. (Filing 33-11, Aff. Gottschalk ¶¶ 4-7.)

● In his letter to Director Bahensky dated July 31, 2018, Plaintiff mentioned that he was "in need of a weekly visit by a Christen [sic] Pastor. I sign up for Church service weekly, have never refused going, was available, but never have seen a pastor since I arrived on April 25, 2018." (Filing 33-4 at CM/ECF p. 27.) Director Bahensky explained by letter to Plaintiff that the HCDC schedules and provides church/bible study services for inmates dependent upon participation of outside volunteers, and that Plaintiff was free to request and coordinate a pastoral visit with the clergy he believed would meet his needs, but that he was not aware of any such special requests having been made by Plaintiff. (Filing 33-4 at CM/ECF p. 30.)

11.    Director Bahensky instructs personnel at the HCDC to make efforts to schedule weekly religious programs for the inmates, but it is difficult to locate and find religious program leaders to consistently present to the particular classification unit where Plaintiff was housed (maximum security, including sex offenders and those accused of crimes of violence or against children). (Filing 33-11, Aff. Gottschalk ¶ 7; Filing 33-1, Aff. Bahensky ¶ 13.)

12.     When Plaintiff arrived at the HCDC on April 25, 2018, the U.S. Department of Justice provided a summary of his medical history and status and a transfer of his medications. Plaintiff's booking assessment did not denote any back or shoulder injuries. (Filing 33-1, Aff. Bahensky ¶ 11; Filing 33-6 at CM/ECF pp. 1-2.)[10]

13.     During the six months he was housed there, Plaintiff submitted many other requests to the HCDC pertaining to alleged medical ailments or issues other than those already outlined above, including the following.

● On May 1, 2018, Plaintiff submitted a request to "Medical" stating, "Need to contact VA to get my hearing aid fixed." (Filing 33-6 at CM/ECF p. 7.) Plaintiff's jail medical chart indicates he was seen by a medical professional on May 2, 2018, and a narrative note was generated indicating that the nurse accepted Plaintiff's report that his right hearing aid no longer worked, and the nurse took both hearing aids to check on supply. (Filing 33-6 at CM/ECF p. 6.)

● On June 7 and 14, 2018, Plaintiff submitted requests to "Medical" inquiring about his hearing aids, to which an ACH nurse replied, "we have them," and "have family contact VA." (Filing 33-6 at CM/ECF pp. 9, 12-13.)

---

[10] After representing during discovery that he did not have any medical records supporting his claimed medical conditions (Filing 33-10 at CM/ECF pp. 2-4), Plaintiff has now filed what he claims are medical records from the Douglas County Department of Corrections showing that he had previously sought medical treatment for back and shoulder issues. Although not explicitly stated, Plaintiff seems to imply that the Defendants should have procured his past medical records. (Filing 34 at CM/ECF p. 7; Filing 35 at CM/ECF pp. 7-28.) Plaintiff has not submitted evidence that he authorized the release of such medical information to the HCDC. *See, e.g.*, *Scher v. Ortwerth*, No. 4:03-CV-787, 2004 WL 3622037, at *15 (E.D. Mo. July 12, 2004) (noting prisoner's revocation of prior authorization for release of medical information to jail).

● On July 11, 2018, Plaintiff submitted a written grievance form asking for his hearing aids and glasses to be fixed or replaced, teeth cleaning, a cancer test, "Fix left rotator cup," "take me to VA for hearing aid and surgery," and "Give me 8 hours of uninterrupted sleep with very low light levels." (Filing 33-4 at CM/ECF p. 33.) The Assistant Director responded in writing indicating that routine, non-emergency preventative dental exams are not provided; Plaintiff could release his glasses and hearing aids to friends or family to be repaired; Plaintiff could be seen by the contracted medical providers upon request to address his alleged shoulder issue; and "our facility light levels already comply with State Jail Standards." (Filing 33-4 at CM/ECF p. 33.)

● On July 14, 2018, Plaintiff submitted a grievance appeal stating that he expected the facility to get him "hearing, vision, dental, and surgery treatments, and 8 hours of uninterrupted sleep a night." The Assistant Director responded that the guidelines had been explained and his medical needs were being addressed. (Filing 33-5 at CM/ECF p. 21.)

● In a letter to Director Bahensky dated July 31, 2018, Plaintiff stated that his inability to get "8 hours of uninterrupted sleep per night in dark conditions" "results in shorter lifetimes and possibly increased alzheimers disease," and indicated his need for an "Eye exam and new glasses," "Hearing exam and repaired hearing aids," dental exam, teeth cleaning, cancer check, and "Dr. Exam of left shoulder cap and MRI and surgery to repair it." (Filing 33-4 at CM/ECF p. 27.) Director Bahensky responded by letter to each of Plaintiff's medical requests, explaining that the "lights out" rules complied with Nebraska Jail Standards and permitted sufficient hours for sleep; the facility could provide reading glasses but not routine eye, hearing, or dental exams unless afforded by the U.S. Marshal[11]; Plaintiff was welcome to contact

---

[11] Plaintiff's "objections" to this Material Fact and others—in the form of explaining the physical state of his glasses and hearing aids, how his hearing aids

friends or family about repairing or replacing his hearing aids and needed to contact the U.S. Marshal for examination needs; and Plaintiff should contact Medical using the kiosk to be seen by a medical professional about any symptoms he might be experiencing that would warrant a cancer check or treatment for a shoulder injury. (Filing 33-4 at CM/ECF pp. 29-30.)

● On August 4, 2018, Plaintiff submitted a request to "Medical" seeking "hearing batteries #312 and bandaid," which was responded to by an ACH nurse stating, "Given by noc shift." (Filing 33-5 at CM/ECF p. 37.)

● On August 10, 2018, Plaintiff submitted two separate requests to "Medical," stating, "I need my hearing aids fixed. They don't work right because right one is broken. contact VA or marshal for help," and "i can't sleep and need medical help." (Filing 33-5 at CM/ECF pp. 44-45.) Plaintiff's jail medical chart indicates he was seen by a medical professional on August 11, 2018, and it was noted that Plaintiff did not bring his hearing aids to the visit, but he was able to hear the nurse when she used a normal voice tone, and no new medical orders were given. (Filing 33-6 at CM/ECF p. 14.)

● On September 19, 2018, Plaintiff submitted a request to "Medical" stating, "my back hurts bad. can't walk to medical." (Filing 33-6 at CM/ECF p. 22.) Plaintiff's jail medical chart shows that he was examined by an ACH medical professional on September 20, 2018, and was educated to do stretches for his back pain, but no new medical orders were given. (Filing 33-6 at CM/ECF p. 21.)

● On September 26, 2018, Plaintiff submitted a request to "Medical" stating, "shoulder, hiccup, back pains aggr[a]vated." (Filing 33-5 at CM/ECF

were damaged, and how other correctional institutions handled his eye, ear, and other medical needs (Filing 34 at CM/ECF pp. 8-11)—do not controvert the contents of Plaintiff's complaints about these issues and the HCDC's responses thereto.

p. 98.) Plaintiff's jail medical chart shows that he was examined by a medical professional on September 27, 2018, about his shoulder and back complaints. The chart notes that Plaintiff had a steady gait, was able to complete stretches and bend to his toes, and was given no new medical orders, but was educated to do stretching exercises and increase his water-intake and activity levels. (Filing 33-6 at CM/ECF p. 23.)

14.    On or about October 23, 2018, the U.S. Department of Justice transferred Plaintiff out of the HCDC to a different holding facility. (Filing 33-4 at CM/ECF pp. 35-37.)

15.    Law enforcement agencies will generally not accept custody of an inmate who appears or claims to be in medical distress without first seeking medical clearance, but the federal authorities who took Plaintiff into their custody for transfer on October 23, 2018, did so without raising any concerns about his medical status. (Filing 33-1, Aff. Bahensky ¶ 16.)

## II.  STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial responsibility of informing the district court of the basis for the motion, and must identify those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (internal quotation marks and citation omitted). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks and citation omitted).

"On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (internal quotation marks and citations omitted). But "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks and citations omitted).

"The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Barber v. C1 Truck Driver Training, LLC,* 656 F.3d 782, 791-92 (8th Cir. 2011) (internal quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson,* 643 F.3d at 1042 (internal quotation marks and citation omitted).

## III. DISCUSSION

### A.  Claims Against Defendant Bahensky Individually

Bahensky asserts that he is entitled to summary judgment because he is immune from suit in his individual capacity under the doctrine of qualified immunity.  "Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Harrison,* 635 F.3d 354, 358 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "Stated another way, qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information that the defendant possessed." *Smithson v. Aldrich,* 235 F.3d 1058, 1061 (8th Cir. 2000) (internal quotation and citation omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.*

Qualified immunity requires a two-part inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). If no reasonable fact-finder could answer yes to both of these questions, the official is entitled to qualified immunity. *Id*. "Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009).

### 1.  Violation of a Constitutional Right

For qualified immunity purposes, the first question is whether Plaintiff has established a violation of his constitutional rights. I shall examine each aspect of Plaintiff's Fourteenth Amendment claim separately.

### a.  Conditions of Confinement

Because Plaintiff was a federal pretrial detainee at the HCDC at the time the Defendants allegedly violated his constitutional rights, the court analyzes Plaintiff's conditions-of-confinement claims under the Fourteenth Amendment instead of the Eighth Amendment, which applies to convicted prisoners. *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010) (analyzing whether manner of transporting pretrial detainee to courthouse constituted punishment). "Under the Fourteenth Amendment, a pretrial detainee's constitutional rights are violated if the detainee's conditions of confinement amount to punishment," *id.*, which includes "penalties that transgress today's broad and idealistic concepts of dignity, civilized standards, humanity, and decency" and "that deprive[] inmates of the minimal civilized measures of life's necessities." *Id.* (internal quotation marks and citations omitted).

In evaluating "whether the conditions of pretrial detention are unconstitutionally punitive, [the court must] review the totality of the circumstances

of a pretrial detainee's confinement," including "whether an official's conduct was reasonably related to a legitimate governmental interest." *Id*. at 810. Specifically,

> [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id*. (quoting *Bell v. Wolfish,* 441 U.S. 520, 538-39 (1979) (internal quotations and citations omitted)).

Further, in analyzing a pretrial detainee's conditions-of-confinement claims, the court is to apply "the same deliberate indifference standard as is applied to Eighth Amendment claims made by convicted inmates." *Id*. at 809 (internal quotation marks and citation omitted). The Eighth Amendment's prohibition against "cruel and unusual punishments" requires that prison officials provide humane conditions of confinement. "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citation omitted). "The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities," *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996), such as "adequate food, clothing, shelter, and medical care, and . . . reasonable measures to guarantee

the safety of the inmates." *Farmer*, 511 U.S. at 832 (internal quotations and citations omitted).

To prevail on a conditions-of-confinement claim, an inmate must show (1) that the alleged deprivation of rights was sufficiently serious; and (2) that prison officials acted with "deliberate indifference" toward conditions at the prison that created a substantial risk of serious harm to the inmate. *Farmer*, 511 U.S. at 834; *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause [of the Eighth Amendment], whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) ("we hold that deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care, and reasonable safety").

### i. Time Out of Cell Limited to Two Hours

Plaintiff argues that restricting him, a pretrial detainee, to his cell for 22 hours a day after the inmate fight that occurred in his housing unit was unconstitutional "punishment."[12] As stated above, whether such a cell restriction on a pretrial detainee amounts to unconstitutional "punishment" requires the court to decide whether the restriction is imposed for the purpose of punishment or, instead, is rationally related to a legitimate nonpunitive governmental purpose and is not excessive in relation to that purpose. *Bell*, 441 U.S. at 538, 561. *See also Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) (pretrial detainees may not be punished,

---

[12] "[T]he Due Process Clause prohibits any punishment of a pretrial detainee, be that punishment cruel-and-unusual or not." *Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014).

and whether particular restriction or condition accompanying pretrial detention is punishment turns on whether restriction or condition is reasonably related to legitimate governmental objective).

> Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline.

*Whitley*, 475 U.S. at 321-22 (internal quotation marks and citation omitted). How best to preserve order and discipline is "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell*, 441 U.S. at 548 (internal quotation marks and citation omitted); s*ee also Holden v. Hirner*, 663 F.3d 336, 341-42 (8th Cir. 2011) ("Courts must give substantial deference to prison officials to determine the best methods for dealing with dangerous inmates in the volatile environment that is prison life." (internal quotation marks and citation omitted)).

Here, the evidence shows that Plaintiff was housed in a highly restrictive area of the jail for his own protection due to the nature of his criminal charges. Plaintiff acknowledges in his Complaint, and the evidence establishes, that a large disturbance in his housing unit in late August 2018 led to a lockdown that restricted prisoners' time out of their cells to two hours per day on a rotating schedule, with programming still available, for the two remaining months Plaintiff was housed at the facility before being transferred to another institution. There is further evidence that the HCDC Assistant Director found the lockdown necessary to "address the multitude of verbal and written threats." (Filing 33-4 at CM/ECF p. 23.)

Subjecting Plaintiff and his fellow inmates to such a lockdown in their restrictive housing unit was rationally related and proportionate to the legitimate nonpunitive governmental purposes of protecting the inmates in Plaintiff's housing unit from each other and maintaining order until the threat of continued unrest subsided. In the absence of any evidence that the cell restriction was imposed for the very purpose of punishment—and there is none here—the court must give the HCDC administrators "wide-ranging deference" in the manner in which they chose to "preserve internal order and discipline and to maintain institutional security," especially when the restriction was "taken in response to an actual confrontation with riotous inmates" and also served as a "preventive measure[] intended to reduce the incidence of these or any other breaches of prison discipline." *Whitley*, 475 U.S. at 321-22 (internal quotation marks and citation omitted).

Therefore, the HCDC's restriction on Plaintiff's time out of his cell did not constitute "punishment" within the meaning of the Due Process Clause. *Bell*, 441 U.S. at 538-40 (maintaining safety and internal order within institution are permissible nonpunitive objectives); *Holden*, 663 F.3d 336, 340-41 (8th Cir. 2011) ("Prison officials have a duty to protect prisoners from violence at the hands of other prisoners."); *Schoelch v. Mitchell*, 625 F.3d 1041, 1046 (8th Cir. 2010) (pretrial detainee's custodians have duty to protect detainee under Due Process Clause of Fourteenth Amendment); *Whitfield v. Dicker*, 41 F. App'x 6, 7 (8th Cir. 2002) (unpublished) (pretrial detainee's Fourteenth Amendment claims failed because detainee did not create genuine issue of material fact that defendants confined him to administrative segregation for punitive reasons rather than for institutional security); *Rust v. Grammer*, 858 F.2d 411, 413 (8th Cir. 1988) (cancellation of yard time for 13 days as part of lockdown undertaken to control prison disturbance was not Eighth Amendment violation when court was "satisfied that prison officials . . . acted in good faith to restore order in the adjustment center and that each of the restrictions imposed had a penological justification"); *Rupert v. Mills*, No. 3:14-CV-161, 2015 WL 2419154, at *5 (E.D. Ark. May 20, 2015) (keeping all inmates, including pretrial detainees, in cells 23 hours per day was reasonably related to legitimate government objective of safety because of guard/inmate ratio; "Plaintiffs'

vague allegations that they were denied outdoor recreation are insufficient to create a genuine issue of material fact on this issue."); *Dale v. Brott*, No. 12-383, 2013 WL 12074952, at \*12 (D. Minn. July 23, 2013), *report and recommendation adopted*, No. 12-CV-0383, 2013 WL 12074953 (D. Minn. Sept. 5, 2013), *aff'd,* 562 F. App'x 551 (8th Cir. 2014) (pretrial detainee's 42 days of confinement with limited hours out of cell was not punishment that required due process when he still had access to commissary, library cart, television, visitation, clergy visits, and when jail had legitimate nonpunitive reasons for placing detainee in that housing unit and court was required to give that determination "due deference"); *Miller v. Powers*, No. 6:08-4177, 2009 WL 255983, at \*1, \*5 (D.S.C. Feb. 2, 2009) (granting prison official's motion for summary judgment on pretrial detainee's conditions-of-confinement claim where detainee was subject to 11-day lockdown after riot involving several inmates because evidence demonstrated that lockdown was based upon security needs and desire to maintain order; "The actions taken by the SCDF were not a form of punishment but essential to maintain good order and discipline following a riot.").

### ii. Cold Conditions in Cell

Plaintiff claims that Defendant Bahensky deprived him of the single, identifiable human need of warmth by keeping his cell and the dayroom at too low of a temperature. *See Tokar v. Armontrout*, 97 F.3d 1078, 1082 (8th Cir. 1996) (conditions of confinement may violate Eighth Amendment when conditions have effect of depriving inmate of single, identifiable human need such as warmth, giving example of low cell temperature at night combined with failure to issue blankets (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

First, there is no evidence that the conditions caused by the alleged cold temperature in Plaintiff's cell and dayroom were objectively, sufficiently serious. Plaintiff has presented no evidence that the temperature in those areas was ever below the 65- to 80-degree range required by the Nebraska Minimum Jail Standards; in fact, computerized temperature readings taken in response to Plaintiff's

complaints were 72, 75.3, and 78.2 degrees, and at the same time Plaintiff complained it was too cold, other inmates complained that the temperature was too hot.

Second, even if the conditions were sufficiently serious, and even if Defendant Bahensky was aware of such conditions, there is no evidence that he was deliberately indifferent to an excessive risk to Plaintiff's health or safety. There is no evidence that Plaintiff developed an illness related to the alleged cold. Rather, the undisputed evidence shows that Plaintiff was seen and examined promptly by the HCDC medical unit each time he logged a complaint related to his health and the ambient temperature; was educated to wear socks, increase his water intake, and exercise; and was issued an extra blanket.

Simply put, there is neither evidence of an excessive risk to Plaintiff's health or safety caused by the allegedly cold temperatures nor deliberate indifference thereto. Accordingly, Plaintiff has failed to establish that the temperature in his cell and the dayroom was punishment in violation of the Fourteenth Amendment. *See Biesanz v. Ferguson*, No. 10-5017, 2012 WL 601585, at *7 (W.D. Ark. Jan. 19, 2012), *report and recommendation adopted*, No. CIV. 10-5017, 2012 WL 601590 (W.D. Ark. Feb. 23, 2012) (jail's policy of keeping temperatures between 65 and 80 degrees was not unconstitutional punishment when jail used computerized system to monitor and control temperature, system was operated by maintenance staff, and there was no evidence that such policy was not adhered to whenever possible); *Keating v. Helder*, No. CIV. 08-5243, 2011 WL 3703415, at *14 (W.D. Ark. Apr. 11, 2011), *report and recommendation adopted*, No. CIV. 08-5243, 2011 WL 3703264 (W.D. Ark. Aug. 23, 2011) (pretrial detainee's allegations of cold conditions in segregation cell did not establish deprivation of single identifiable human need when evidence established that jail temperature was kept between 65 and 85 degrees and blankets were passed out each evening and collected in the morning).

### iii.  Lights-Out Policy Allowing 5-6 Hours Sleep

Plaintiff next complains that he suffered from sleep deprivation at the HCDC due to the night-time lighting conditions in his cell. According to the evidence, the HCDC turned lights out at 11:00 p.m. and back on at 5:00 a.m. each day. (Filing 33-8 at CM/ECF p. 12.) Plaintiff claims that this schedule resulted in him getting only five to six hours of uninterrupted sleep per night which, he says, "will lead [to] [A]lzheimer's as well as other serious physical and mental diseases as well as a shortened life-time." (Filing 1 at CM/ECF p. 15; Filing 13 at CM/ECF p. 12.)

Other than Plaintiff's predictions of dire future consequences from his lack of sleep, there is no evidence that Plaintiff suffered any illness or impairment from his lack of sleep, much less a substantial risk of serious harm. In the absence of conditions that posed a risk of serious harm to Plaintiff, there was nothing toward which Defendant Bahensky could act with deliberate indifference. Further, having a six-hour lights-out policy in the jail cells that balanced the needs of early risers and night owls can hardly be characterized as a transgression of societal standards of dignity, humanity, and decency, nor is there any evidence that the policy was for the purpose of punishment. Accordingly, Plaintiff has failed to prove that the HCDC's lighting practices amounted to unconstitutional punishment. *See Nicholas Cortez Addison Adc #162451 v. Martin*, No. 3:15CV00134, 2016 WL 6634881, at *4 (E.D. Ark. Nov. 8, 2016) (summary judgment granted in favor of defendant detention center administrator when detainee alleged, among other things, that lighting in detention center kept him awake because evidence indicated that facility lighting was in compliance with Department of Health and Criminal Detention Facilities Review Committee annual reports and detainee did not provide any responsive proof); *Biesanz*, 2012 WL 601585, at *7 (jail's policy of dimming cell lights at night to simulate "night lights" for safety reasons was not unconstitutional punishment when pretrial detainee alleged only that he lost sleep, but did not seek medical help for his alleged sleeplessness and did not claim to have "any other physical impairment from the constant lighting"); *Philmlee v. Byrd*, No. 4:10CV00221, 2010 WL 6549829, at *3 (E.D. Ark. Oct. 21, 2010), *report and recommendation adopted*,

No. 4:10CV00221, 2011 WL 1542655 (E.D. Ark. Apr. 25, 2011) (leaving dimmed lights on at night in cells and in guard's area did not deny detainee minimal civilized measure of life's necessities or constitute substantial risk of serious harm). *See, e.g.*, *Wills v. Terhune*, 404 F. Supp. 2d 1226, 1231 (E.D. Cal. 2005) (recommending denial of plaintiff inmate's motion for preliminary injunction where plaintiff claimed constant lighting of his cell resulted in problems sleeping, headaches, visual impairment, and other physical and emotional problems; evidence showed night lighting was only bright enough for security concerns and there was no supporting evidence of alleged physical impairment); *King v. Frank*, 371 F. Supp. 2d 977, 985 (W.D. Wis. 2005) (constant low-level illumination of prisoner's cell during sleep hours did not rise to level of Eighth Amendment claim where health workers found no serious medical consequences from the lighting and plaintiff demonstrated neither "substantial risk of serious harm" nor deliberate indifference to that harm).

### iv.  Religious Services

Plaintiff claims that he is "a Christian and my beliefs require that I attend a religious service conducted by an ordained minister weekly, and communion once a month" and that the Defendants failed to accommodate those requirements. (Filing 13 at CM/ECF p. 16.)

The undisputed evidence establishes that HCDC Director Bahensky routinely instructs personnel at the HCDC to schedule weekly religious programs for the inmates, but it is difficult to locate and find religious program leaders to consistently present to the particular classification unit where Plaintiff was housed (maximum security, including sex offenders and those accused of crimes of violence or against children). (Filing 33-11, Aff. Gottschalk ¶ 7; Filing 33-1, Aff. Bahensky ¶ 13.) While Plaintiff was housed at the HCDC, religious programs were offered to his unit whenever a religious provider could be located and would appear for them. According to the Assistant Director of the HCDC, there were at least 11 Christian religious programs held at the facility and available to Plaintiff's unit from January to June 2018. (Filing 33-11, Aff. Gottschalk ¶¶ 4-7.) While it is uncertain exactly

how many religious programs were offered to Plaintiff's unit from April to October 2018 when Plaintiff was housed at the facility, "such programs were offered whenever a willing provider could be located to appear." (Filing 33-11 at CM/ECF p. 3.)

Director Bahensky explained by letter to Plaintiff that the HCDC schedules and provides church/bible study services for inmates depending upon the participation of outside volunteers, and that Plaintiff was free to request and coordinate a pastoral visit with the clergy he believed would meet his needs, but Plaintiff made no such requests. (Filing 33-4 at CM/ECF p. 30; Filing 33-11, Aff. Gottschalk ¶ 7 (confirming that Plaintiff never made a request to see or talk by telephone to a particular pastor or religious provider).)

The Eighth Circuit has held that mere deprivation of access to religious services does not violate the Eighth Amendment because it does not "inflict unnecessary or wanton inflictions of pain, nor [does it] involve 'life's necessities,' such as water, food, or shelter." *Phillips v. Norris*, 320 F.3d 844, 848 (8th Cir. 2003) (37-day isolation without contact visitation or religious services did not violate Eighth Amendment). Further, there is no evidence that HCDC personnel attempted to punish Plaintiff with a lack of religious programming; rather, they actively sought to schedule church services and bible study, but such programming was completely dependent upon the unpredictable appearance of clergy who were willing to serve Plaintiff's housing unit.

Under these circumstances, Plaintiff has failed to prove that the sporadic religious activities available to his housing unit at the HCDC constituted punishment within the meaning of the Fourteenth Amendment. *Landers v. Frakes*, No. 8:17CV371, 2019 WL 1517122, at *13 (D. Neb. Apr. 8, 2019) (no Eighth Amendment violation to deprive inmate of ability to attend religious services while in segregation because such deprivation did not inflict unnecessary or wanton pain and did not involve "life's necessities," such as water, food, or shelter, citing *Phillips*); *Hodgson v. Fabian*, No. CIV. 08-5120, 2009 WL 2972862, at *16 (D.

Minn. Sept. 10, 2009), *aff'd*, 378 F. App'x 592 (8th Cir. 2010) (no violation of Eighth Amendment to limit inmate access to certain tools or methods of practicing his religion, such as incense and herbs, because he still had access to religious services, was not subjected to any physical pain or injury, and was not denied any of "life's necessities"); *Harris v. Moore*, No. 2:04CV00073, 2007 WL 4380277, at *8 (E.D. Mo. Dec. 13, 2007) (no violation of Eighth Amendment to restrict inmate's attendance at religious services to once a week, citing *Phillips*).

### b.  Inadequate Medical Care

Plaintiff complains that the HCDC failed to repair his broken glasses and hearing aids; refused to give him shoulder surgery, proper treatment for back pain, routine dental examinations, and a cancer check; and failed to investigate a medical cause for his constant coldness.

> To prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs. This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it.

*Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* (internal quotation and citation omitted).

> Deliberate indifference is equivalent to criminal-law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate. An obvious risk of harm

> justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate. Deliberate indifference must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision.

*Id.* at 914-15 (internal quotation marks and citations omitted).

Assuming for purposes of Defendants' Motion for Summary Judgment that Plaintiff had an objectively serious medical need that was so obvious that a layperson would easily recognize that a doctor's attention was necessary, Plaintiff has failed to show that Bahensky was deliberately indifferent to that need. On the contrary, the Plaintiff's jail medical chart shows that each of his medical requests and complaints were promptly attended to by the jail's medical professionals supplied through the county's contractor, ACH. The ACH medical personnel who evaluated Plaintiff did not believe, in their professional medical judgment, that his subjective complaints of hearing and vision difficulty, back and shoulder pain, and other issues warranted surgery, a "cancer check," or any other special medical intervention or treatment. Rather, Plaintiff was directed to perform conservative treatment options like stretching, exercising, and increasing his water intake and to contact his supervising entity, the U.S. Marshals Service, for approval of routine eye, hearing, or dental exams. Plaintiff's desire for a particular form of treatment and routine preventative examinations is not the proper basis for a constitutional claim. *Barr v. Pearson*, 909 F.3d 919, 921-22 (8th Cir. 2018) ("[W]hile inmates have a right to adequate medical care, they have no right to receive a particular or requested course of treatment. Indeed, doctors remain free to exercise their independent medical judgment. Thus, [a] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." (internal quotation marks and citations omitted)).

The evidence shows that Director Bahensky fulfilled his responsibility to afford Plaintiff with access to professional medical care, and he investigated and responded to all medical issues of which Plaintiff made him personally aware.

Plaintiff fails to explain how Director Bahensky, who was himself not a medical professional, should have recognized Plaintiff's medical needs as serious or requiring different treatment, when any such conclusion would have been at odds with the assessment of the ACH medical professionals who evaluated Plaintiff. *See Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011) ("Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis and the decision of whether to refer the inmate to outside doctors or dentists."); *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006) ("[I]t is not deliberate indifference when an official relies on the recommendations of a trained professional."); *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) ("A prison's medical treatment director who lacks medical expertise cannot be liable for the medical staff's diagnostic decisions. Prison officials cannot substitute their judgment for a medical professional's prescription." (citations omitted)).

There is simply no showing that Director Bahensky exhibited deliberate indifference to Plaintiff's presumed objectively serious medical needs. *Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019) (deliberate-indifference claim involves a "fact-intensive inquiry that requires [the plaintiff] to clear a substantial evidentiary threshold to succeed on his claim" (internal quotation marks and citation omitted)).

### c.  Conclusion on Claims Against Bahensky Individually

Plaintiff's Fourteenth Amendment claim against Defendant Bahensky individually fails because he has not presented evidence that he was denied access to life's necessities, that any of the disputed conditions of Plaintiff's confinement were imposed for the purpose of punishment, or that Defendant Bahensky knew of and disregarded a substantial risk of serious harm to him.

### 2.  Clearly Established Constitutional Right

Because the Plaintiff has failed to demonstrate that Defendant Bahensky violated his Fourteenth Amendment rights, either Plaintiff's claim fails as a matter

of law or, alternatively, Bahensky is entitled to qualified immunity. *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (if an official did not deprive plaintiff of a constitutional or statutory right, the plaintiff "does not need qualified immunity, as he is not liable under § 1983"); *Ambrose v. Young*, 474 F.3d 1070, 1077 n.3 (8th Cir. 2007) ("[I]f the court finds no constitutional violation occurred, the analysis ends and the issue of qualified immunity is not addressed. . . . This is not to say, however, the defendant official is entitled to qualified immunity. Rather, if no constitutional violation occurred, plaintiff's claim fails as a matter of law because plaintiff did not prove an essential element of the § 1983 claim." (citations omitted)).

Alternatively, because there was no constitutional violation, Defendant Bahensky is entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 243-44 (2009) ("An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment."); *Kulkay v. Roy*, 847 F.3d 637, 646 (8th Cir. 2017) (finding individual defendants entitled to qualified immunity when plaintiff failed to state Eighth Amendment claim); *Ransom v. Grisafe*, 790 F.3d 804, 812-13 (8th Cir. 2015) (because officers' seizure of plaintiff did not violate Fourth Amendment, officers were entitled to qualified immunity).

## B.  Claims Against Hall County and Bahensky in Official Capacity

Hall County cannot be held liable under 42 U.S.C. § 1983 without an underlying constitutional violation by one of its individual officers. Because Defendant Bahensky, a county officer, did not violate the Constitution, Hall County likewise may not be held liable. *Whitney v. City of St. Louis, Missouri*, 887 F.3d 857, 861 (8th Cir. 2018) ("absent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City"); *see also Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017) ("Because we conclude that Officer Hinman did not violate Malone's constitutional rights, there can be no § 1983 or *Monell* liability on the part of Chief Thomas and the City."); *Sitzes v. City of W. Memphis*, 606 F.3d 461, 470 (8th Cir. 2010) (agreeing with district court that plaintiffs' *Monell* claims "could not

be sustained absent an underlying constitutional violation by the officer"); *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* . . . municipal liability.").

## IV.  CONCLUSION

Because Plaintiff did not establish a constitutional claim against Defendant Bahensky individually, and because Hall County cannot be held liable under 42 U.S.C. § 1983 without an underlying constitutional violation by Bahensky, the Defendants' Motion for Summary Judgment must be granted.

IT IS ORDERED:

1.     The Defendants' Motion for Summary Judgment (Filing 32) is granted; and

2.     Judgment shall be entered by separate document.

DATED this 24th day of March, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge